In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2095

HARLEY-DAVIDSON MOTOR COMPANY,
INCORPORATED,

*Plaintiff-Appellant,*

v.

POWERSPORTS, INCORPORATED and
POWERSPORTS OF SEMINOLE COUNTY,
INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 C 132—**J. P. Stadtmueller**, *Judge.*

ARGUED JANUARY 14, 2003—DECIDED FEBRUARY 21, 2003

Before EASTERBROOK, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In this diversity action, Harley-Davidson Motor Company, Inc. ("Harley-Davidson") alleged that PowerSports Inc. and its wholly-owned subsidiary PowerSports of Seminole County, Inc. (collectively "PowerSports") had made fraudulent misrepresentations in order to obtain Harley-Davidson's approval of a transfer of a Harley-Davidson dealership to PowerSports. Harley-Davidson sought rescission of that approval. In granting summary judgment for PowerSports, the district court

held that, even though Harley-Davidson was seeking the equitable remedy of rescission rather than tort damages, its misrepresentation claim was barred under Wisconsin's economic loss doctrine. For the reasons set forth in the following opinion, we reverse the judgment of the district court.

# I

# BACKGROUND

## A. Factual Background

### 1.

On November 8, 1999, Harley-Davidson received a request from Scott Smith of Harley-Davidson of Seminole County, a dealership located in Fern Park, Florida ("Fern Park dealership"), to approve the sale of that dealership to PowerSports of Seminole County. Florida law required Harley-Davidson to respond to the request for approval of the transfer within 60 days.[1]

Harley-Davidson has a unique business model based on active dealership contact with its customers. This system is designed to enhance customer satisfaction with ownership. In Harley-Davidson's words, "Harley-Davidson sells lifestyle and relationships, not just goods and services." R.46, Ex.78 at 4. Consequently, Harley-Davidson

---

[1] Harley-Davidson had to either approve or object to the transfer within the 60 days. A failure to respond is deemed an approval. *See* Fla. Stat. § 320.643(1). If Harley-Davidson had objected, then PowerSports would have had 60 days following that rejection to file with the Florida Department of Highway Safety and Motor Vehicles to determine if the rejection violated Florida law. *See id.*

dealers are required to have an on-site owner-operator, and Harley-Davidson requires that new dealer applicants be committed to its business approach. Harley-Davidson also does not allow any of its dealerships to be publicly owned.

On November 24 and December 13, 1999, Harley-Davidson sent letters inquiring about PowerSports' interest in and ability to purchase and run the dealership in compliance with Harley-Davidson's dealer contract and expectations. The November 24th letter explained to Power-Sports that it could not go public and maintain the dealership because, under the dealer contract, "no publicly-owned corporation may, directly or indirectly, in whole or in part, own and/or operate any Harley-Davidson dealership." R.39, Ex.54 at 1. The letter also inquired about Power-Sports' plan for "using a d/b/a that doesn't include the PowerSport's name." *Id.* at 3. In the December 13th letter, Harley-Davidson specifically asked such questions as, "Why does Power Sports want to purchase the Fern Park dealership?"; "What are Power Sport's plans for the Fern Park dealership?"; "What is [PowerSports'] plan for compliance with Harley-Davidson's on-site owner operator requirement?" R.46, Ex.32.

On December 16, 1999, representatives of Harley-Davidson and PowerSports met to discuss the proposed transfer. PowerSports provided Harley-Davidson with an "Operating Plan" for the Fern Park dealership. *See* R.46, Ex.34. The plan indicated that PowerSports would focus on the local Seminole County, Florida, market. In the plan, PowerSports stated that it would "distinguish the [Fern Park] dealership by offering unparalleled attention to our customers," and that it would "promote motorcycling, encourage rider education, support our local community, and participate in local charities, as well as the Seminole

4                                              No. 02-2095


County Harley Owners Group." *Id.* at 1. It stated under the heading "marketing strategy" that it would "identify potential customers through customers who frequent our store, active participation in the Harley Owners Group, and development of contacts at bike events, poker runs, and community events," and that it would "advertise in bike magazines, newspapers, billboards, and through direct mail." *Id.* It also planned "to promote events such as open houses, pig roasts, and customer appreciation days." *Id.* The plan explained that PowerSports would create "friendship[s]" with its customers rather "than the traditional 'customer-dealer' relationship." *Id.* at 2. The plan made no mention of any plans involving the internet or of purchasing multiple brands over the internet either at home or at the dealership, of turning the Fern Park dealership into a web-interfaced facility center, or of PowerSports going public.

Similarly, at the December 16th meeting, representatives of PowerSports orally assured Harley-Davidson that PowerSports would focus on the local market and would distinguish itself by doing "the best in Florida," R.46, Ex.87 at 2, that it would operate an exclusive Harley-Davidson dealership, and that it would not use the PowerSports name in conjunction with the Harley-Davidson name or logo. At the meeting, public ownership was discussed. Harley-Davidson representatives testified that PowerSports representatives stated at the meeting that, although it had discussed public ownership before, PowerSports was "[n]owhere near" going public, that it had no present plans to take the company public, and that, if it ever did go public, it would divest itself of the Harley-Davidson dealership. R.39, Ex.E at 65-66; *see* R.46, Exs.78, 87, 89, 103, 108. Harley-Davidson representatives asked the PowerSports representatives whether Power-Sports would be willing to sign a separate agreement

covering public ownership, the on-site owner-operator requirement, limits on the number of Harley-Davidson dealerships PowerSports would acquire, and the maintenance of the Fern Park dealership as an exclusive Harley-Davidson dealership. R.39, Ex.D at 165-69. According to the testimony of the Harley-Davidson representatives, the PowerSports representatives indicated they would sign such an agreement. However, Harley-Davidson never provided such a separate agreement for PowerSports to sign.

At the December 16th meeting, PowerSports also gave Harley-Davidson a written response to the November 24th and December 13th questions. The written response stated in part: "With respect to your concern about PowerSports, Inc. wanting to go public, you requested that [PowerSports and its representatives] to specifically confirm that they acknowledge, accept, and will comply [with] all requirements of the Harley-Davidson Dealer Contract. It is our intent to comply with all lawful aspects of the Harley-Davidson Motor Company Dealer contract." R.39, Ex.33 at 1.

In the course of discovery, PowerSports produced documents, dating from 1997 and continuing through January 3, 2000, that indicated that PowerSports had plans inconsistent with its representations at the December 16th meeting. The documents indicated that PowerSports planned to go public and to become an internet company that consolidated its dealerships and sold its products almost exclusively on the internet rather than in dealerships. For example, on January 3, 2000, PowerSports created a list of position points and draft slides to use for an upcoming investor roadshow. This document, not disclosed earlier to Harley-Davidson, indicated that PowerSports was planning to become a pure internet business and that it

viewed dealerships as "a necessary evil that we bought and integrated only because we needed the franchises and the fulfillment capability. The only reason why we would invest any new capital in our existing dealerships is to expand their physical space to handle the greater volume of internet orders we will get." R.46, Ex.123 at 1. The document stated that PowerSports wanted "to distance [itself] from brick and mortar as much as possible." *Id.* None of these documents were disclosed to Harley-Davidson. Moreover, in November or early December 1999, PowerSports retained investment bankers to discuss and plan an upcoming IPO. This development also was not disclosed to Harley-Davidson.

PowerSports maintains that these documents are immaterial because "the most recent information about PowerSports' internet plans and desire to go public was disclosed to Harley in a timely manner." R.50 at 1-5. In this respect, PowerSports refers to the draft offering memorandum that it mailed to Harley-Davidson on January 4th. *See id.* We shall discuss this document further below.

On December 31, 1999, Harley-Davidson faxed a letter to PowerSports that included a copy of Harley-Davidson's public ownership policy and its policy on multiple ownership. In the letter, Harley-Davidson requested that PowerSports provide more documents and information; it specifically requested information concerning PowerSports' upcoming private placement.

On the morning of January 3, 2000, PowerSports faxed a letter to Harley-Davidson stating that "later today" it would provide the requested information, including the draft memorandum for the upcoming PowerSports private placement offering. R.39, Ex.76. PowerSports did not provide Harley-Davidson with the information on January 3rd; rather, as recited below, it mailed the infor-

mation to Harley-Davidson on January 4th, which arrived in Harley-Davidson's mailroom on January 5th.

On January 3rd, Harley-Davidson representatives met at their offices and made the decision to approve Power-Sports' request to purchase the dealership. On January 4th, and concluding on the morning of January 5th, Harley-Davidson prepared an approval letter to send to Power-Sports. The letter recited the representations made by PowerSports upon which Harley-Davidson was relying in making its decision, including that PowerSports would not use the PowerSports name in conjunction with the Harley-Davidson name, that it would not sell new motorcycles manufactured or distributed by any entity other than Harley-Davidson, and that, as advised in the December 16th meeting, it had no plans to go public and that, if it did decide to become publicly owned, it first would divest itself of ownership of the Harley-Davidson dealership. *See* R.46, Ex.78 at 2.

On the morning of January 4th, a PowerSports representative asked Harley-Davidson when it would deliver its decision to PowerSports. Harley-Davidson replied that it would deliver its decision by close of business on January 5th. Harley-Davidson's letter of approval was completed on the morning of January 5th and faxed and mailed to PowerSports that afternoon.

Also on January 4th, PowerSports sent by overnight delivery a letter and the draft memorandum to Harley-Davidson and to its attorney. Although the memorandum was delivered to Harley-Davidson's mailroom on January 5th, it was not brought to the attention of anybody at Harley-Davidson until January 6th. Harley-Davidson's counsel also did not see the letter until after Harley-Davidson had faxed its approval to PowerSports.

The memorandum explained that PowerSports intended this financing to be the "last private round of capital" before an IPO in the second quarter of the year 2000. R.46, Ex.40 at 8. It also stated that PowerSports was moving away from "brick and mortar" dealerships in order to become primarily an internet business, where customers could "compare 14 different brands at once, and [be] thereby freed from the cumbersome task of having to travel and visit multiple dealerships." *Id.* at 11. The memorandum explained that PowerSports was establishing the first internet business with "nationwide and worldwide fulfillment" capacity for power sport vehicles and that it had spent the last "two years identifying, negotiating, acquiring and integrating eleven of the largest dealerships in Florida." *Id.* at 18. It noted that, with "two pending acquisitions," one of which was the Harley-Davidson Fern Park dealership, PowerSports "[would] be the only company in the United States capable of executing a worldwide Internet fulfillment strategy for every major brand, vehicle, part, accessory and finance and insurance product." *Id.* The memorandum stated that its website would "enable[] customers worldwide to access a full array of powersports products from the convenience of the customer's home/office computer without ever having to visit a dealership." *Id.* at 51.

Further, the memorandum explained that PowerSports would be transforming its dealerships into "Internet showrooms" so that even customers who came into a dealership would sit down at computers at the dealership and log online to make their purchases. *Id.* The memorandum notes that PowerSports would make this changeover of "dealerships" to "Web interface" fulfillment centers on March 31, 2000, "at its twelve (including the Harley acquisition) Florida dealerships which form the backbone of [PowerSports'] worldwide fulfillment capability." *Id.* The memorandum noted that PowerSports needed to acquire

dealerships in close proximity to one another in order to efficiently integrate them into one mega-dealership. *See id.* at 53. In the appendix, the memorandum noted that "eleven dealerships have already been integrated to operate as one 'mega-dealer' and, [that] the addition of the Harley-Davidson dealership under contract, will permit the Company to profitably fulfill each product described in these projections." *Id.* at App. 5.

Finally, the memorandum explained that PowerSports had negotiated the purchase of

> its first Harley-Davidson dealership. *This dealership shall be integrated into the Company's network of eleven Florida dealerships and will be turned into an Internet fulfillment center* for Harley-Davidson new and pre-owned vehicles. . . . This acquisition will provide ePowerSports.com with the ability *to source and fulfill over the Internet vehicles, parts and accessories* for the remaining major franchise it does not currently hold, Harley-Davidson.

*Id.* at App. 8 (emphasis added).

However, the memorandum did note that PowerSports, upon acquiring a dealership, "must operate the dealership in accordance with the applicable franchise agreement." *Id.* at 62.

## B. District Court Proceedings

On January 18, 2000, Harley-Davidson filed this action. In its amended complaint, Harley-Davidson alleged that PowerSports intentionally and/or negligently had made material misrepresentations including affirmative statements and omissions in order to induce Harley-Davidson to approve the transfer of the dealership, that Harley-

Davidson reasonably relied on those misrepresentations in approving the transfer, and that Harley-Davidson was induced by the misrepresentations to approve the transfer. *See* R.26 at 11. Harley-Davidson sought remedies including (1) an order rescinding and canceling the transfer or an order requiring PowerSports to sell or transfer the dealership to an unaffiliated new dealer acceptable to Harley-Davidson;[2] (2) consequential and incidental damages suffered as result of PowerSports' conduct; (3) punitive damages; and (4) injunctive and declaratory relief. *See id.* at 12-14.

PowerSports ultimately moved for summary judgment on all of Harley-Davidson's claims.[3] It submitted that Wis-

---

[2] Harley-Davidson originally sought an injunction preventing the transfer of the dealership to PowerSports. The district court denied relief, finding that the harm was not irreparable because "PowerSports could be made to divest itself of the franchise should the need arise." R.24 at 5.

[3] PowerSports had moved earlier to dismiss on the grounds of abstention, primary jurisdiction and failure to state a cause of action. In responding to this initial motion, Harley-Davidson had argued that the Florida Department of Highway Safety and Motor Vehicles did not have any special expertise or jurisdiction to adjudicate common law claims. In the course of its argument, Harley-Davidson referred to its misrepresentation claims as common law tort claims. *See* R.20 at 18, 23 & 25; Appellees' App. at 284, 285, 286 & 287. At another point, it referred to its claims as "common law" claims and referenced contract authority for its rescission claim for misrepresentation. R.20 at 21; *see id.* at 19, 20, 24, 25 & 28. Specifically, Harley-Davidson noted that it could seek rescission under the Supreme Court of Wisconsin case *First National Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530 (Wis. 1980). *See* R.20 at 28. The district court ruled in favor of Harley-Davidson on this ini-
(continued...)

consin's economic loss doctrine[4] barred Harley-Davidson's negligent and intentional misrepresentation claims and that, under our precedent interpreting Wisconsin's economic loss doctrine, Harley-Davidson "cannot maintain any claims for fraud or misrepresentation as a matter of law." R.37 at 7; *see* R.36. Harley-Davidson responded by asserting that it was "not seeking to recover 'economic losses' from PowerSports" and was "not even claiming compensatory damages," but rather was merely seeking "to rescind its consent to the dealership transfer." R.42 at 26. However, Harley-Davidson did state in a footnote that it "also seeks any restitution damages that might be appropriate and punitive damages for PowerSports' intentional misconduct." *Id.* at 8 n.1. Substantively, Harley-Davidson noted the "long-established and well-recognized right to rescind its fraudulently obtained consent," stating that "Wisconsin law clearly recognizes a claim for rescission based on misrepresentation" and citing cases, including *Marine Bank, N.A. v. Meat Counter, Inc.*, 826 F.2d 1577, 1580 (7th Cir. 1987), and *First National Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 538 (Wis. 1980). R.42 at 1, 28.

In its response, PowerSports mentioned (again in a short footnote) the apparent inconsistency in the claim that

---

[3] (...continued)
tial motion to dismiss, referring in its opinion to Harley-Davidson's misrepresentation claims as "tort" claims. R.25 at 4, 5 & 7.

[4] The "economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 845-46 (Wis. 1998).

Harley-Davidson was "not even claiming compensatory damages" and yet was still seeking "restitution damages" and "punitive damages." R.49 at 2 (internal quotation marks omitted). PowerSports' main contention, however, was that the economic loss doctrine barred all fraud and misrepresentation claims regardless of the remedy sought—whether rescission or damages. *See id.* at 2-4.

The district court held that the economic loss doctrine applied because Harley-Davidson was seeking recovery from commercial injury. The court recognized our prior precedent barring tort claims for negligent or strict responsibility misrepresentation under Wisconsin law. The court further noted that "[w]hether the economic loss doctrine bars a claim for intentional misrepresentation that alleges fraudulent inducement [of contract] is an issue over which there has been considerable disagreement." R.52 at 5. Nevertheless, the district court noted that we had ruled in *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960 (7th Cir. 2000), that the economic loss doctrine barred intentional misrepresentation claims alleging fraudulent inducement under Wisconsin law. The district court held that our holding in *Home Valu* was controlling and that it was required, on the basis of this precedent, to dismiss Harley-Davidson's intentional misrepresentation claim. *See* R.52 at 6. The court stated that "Harley-Davidson does not cite to any case which exempts a claim from the economic loss rule simply because the plaintiff seeks rescission rather than damages." *Id.* at 7. The court concluded that "Harley-Davidson cannot avoid application of the economic loss doctrine *by seeking only rescission.* The proper inquiry in determining whether the economic loss doctrine applies is whether the commercial injury also causes personal injury or damage to other property."

*Id.* at 6 (emphasis added).[5] Consequently, the court determined that all of "Harley-Davidson's misrepresentation claims are barred by the economic loss doctrine." *Id.* at 7; *see also id.* at 1 (stating that Harley-Davidson's "claims of negligent and intentional misrepresentation are barred by Wisconsin's economic loss doctrine"). The court granted PowerSports' motion for summary judgment and dismissed with prejudice Harley-Davidson's entire action. R.53.

## II

## DISCUSSION

### A.

We review the grant of summary judgment de novo. Summary judgment is only appropriate when, after construing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 623 (7th Cir. 2002). In PowerSports' view, there is no genuine issue of material fact and it is entitled to judgment as a matter of law.

---

[5] It is apparent from this passage and from PowerSports' brief supporting its motion for summary judgment that PowerSports and the district court did not concern themselves with the punitive damages and "restitution damages" issues, but rather believed that even if all PowerSports sought was rescission of contract, the claim was barred by the economic loss doctrine. Consequently, the court dismissed all of the claims based on fraud or misrepresentation, regardless of the remedy sought, including both the claim for rescission and for punitive damages.

**B**.

**1.**

We first address the district court's determination that this action for rescission of the contract is barred by Wisconsin's economic loss doctrine. The district court believed that its conclusion was compelled by our decision in *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960 (7th Cir. 2000). We shall begin our inquiry by addressing this view.

The district court was correct in stating that, under our holding in *Home Valu*, the economic loss doctrine bars tort damage claims for intentional misrepresentation. However, as we also noted in *Home Valu*, 213 F.3d at 964-65, the Court of Appeals of Wisconsin held to the contrary in *Douglas-Hanson Co. v. BF Goodrich Co.*, 598 N.W.2d 262 (Wis. Ct. App. 1999). More recently, in *Digicorp, Inc. v. Ameritech Corp.*, 650 N.W.2d 321 (Table), Nos. 01-1833, 01-2258, 2002 WL 1277220 (Wis. Ct. App. June 11, 2000) (unpublished opinion), *review granted by* 653 N.W.2d 888 (Wis. 2002), the Court of Appeals of Wisconsin confirmed the view it had expressed earlier in *Douglas-Hansen*. This issue will soon be decided definitively by the Supreme Court of Wisconsin.

The question remains whether the issue at stake in *Digicorp*, and previously decided by the Court of Appeals of Wisconsin and this court, ought to govern the disposition of this case. If the issue does control this litigation, as the district court concluded, a respectful appreciation of the task of the Supreme Court of Wisconsin would require that we either stay our decision until that court decides *Digicorp* or certify the issue in this case to that court. After reflection, however, we have concluded that the issue presently before the Supreme Court of Wisconsin—whether the economic loss doctrine applies to a tort action for

intentional fraudulent inducement—is not implicated in the case before us today. By contrast, today's case presents us with the question of whether Wisconsin would recognize an action for the rescission of a contract. In our view, there is little question that Wisconsin would not apply the economic loss doctrine to bar such action.

A brief review of the legal landscape prior to our decision in *Home Valu* will assist significantly in our placing the problem presently before us in proper perspective. In *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621 (7th Cir. 1993), we determined that tort claims for negligent misrepresentation and strict responsibility misrepresentation were barred by Wisconsin's economic loss doctrine when "two corporations, with the benefit of counsel, negotiate a commercial transaction at arms length." *Id.* at 627-28. After *Badger*, the Western District of Wisconsin, applying Wisconsin law in *Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F. Supp. 1227, 1236 (W.D. Wis. 1997), stated that the rationale under which the economic loss doctrine barred claims for negligent and strict responsibility misrepresentation did not apply for *intentional* misrepresentation claims because such claims involved "intentional acts taken by one party to subvert the purposes of a contract." *Id.* The Western District of Wisconsin noted that a "party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract." *Id.* We implicitly overruled *Stoughton Trailers* in *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co.*, 123 F.3d 675 (7th Cir. 1997). We noted that we had "already predicted that Wisconsin would not allow a negligence or strict liability misrepresentation claim" and concluded that "[w]e perceive no basis for treating Cooper's intentional misrepresentation claim any differently." *Cooper Power*, 123 F.3d at 682.

Following *Cooper Power*, the district courts in Wisconsin faced the question of whether there should be an exception to the *Cooper Power* bar on intentional misrepresentation claims when the claim alleged fraudulent inducement of contract. *See Budgetel Inns, Inc. v. Micros Sys. Inc.*, 8 F. Supp. 2d 1137, 1144-49 (E.D. Wis. 1998) (predicting that Supreme Court of Wisconsin would recognize an exception for fraud in the inducement claims); *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 977-80 (E.D. Wis. 1999) (predicting that Wisconsin would recognize "a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent of the underlying contract" (internal quotation marks and citations omitted)).[6]

This issue came before a Wisconsin state appellate court in *Douglas-Hanson Co. v. BF Goodrich Co.*, 598 N.W.2d 262 (Wis. Ct. App. 1999). The Court of Appeals of Wisconsin

---

[6] The courts in *Budgetel Inns, Inc. v. Micros Systems Inc.*, 8 F. Supp. 2d 1137, 1144-49 (E.D. Wis. 1998), and *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 977-80 (E.D. Wis. 1999), disagreed with each other whether or not the so-called *Huron* limitation should apply even if an exception for intentional misrepresentation claims alleging fraudulent inducement existed under Wisconsin law. The *Huron* limitation, created by a Michigan appellate court, is that an exception to the economic loss doctrine for intentional misrepresentation claims alleging fraudulent inducement is only available "where the claims arise independent from the underlying contract"; that is, "when a claim of fraudulent inducement is 'interwoven' with a breach of contract claim, no independent intentional misrepresentation claim exists and the claim will be barred by the economic loss doctrine." *Budgetel*, 8 F. Supp. 2d at 1145; *see Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995).

upheld a judgment awarding a plaintiff $1.8 million in compensatory damages and one million dollars in punitive damages on an intentional misrepresentation claim. The plaintiff clearly was seeking a "tort remedy." *Id.* at 265. The Wisconsin appellate court concluded "that the economic loss doctrine does not preclude a plaintiff's claim for intentional misrepresentation when the misrepresentation fraudulently induces a plaintiff to enter into the contract." *Id.* The court noted a rationale, very similar to that employed in *Stoughton Trailers*, 965 F. Supp. at 1236, of why an intentional misrepresentation would not be barred by the economic loss doctrine:

> An intentional misrepresentation that fraudulently induces a party to enter into a contract, however, presents a special situation where the parties to the contract appear to negotiate freely, but, in fact, one party's ability to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent conduct.

*Douglas-Hanson*, 598 N.W.2d at 268. The court additionally reasoned that,

> under Wisconsin law, a material misrepresentation of fact may render a contract void or voidable. The economic loss doctrine does not apply to fraudulently induced contracts because the person fraudulently induced to enter the contract can affirm or avoid the contract, and in so electing, has the option of selecting tort or contract damages. The option is inconsistent with the economic loss doctrine, however, which requires that the contract be affirmed.

*Id.* at 268-69. The Supreme Court of Wisconsin granted a petition for review in *Douglas-Hanson*, but was equally divided on the question of whether the appellate court

was correct in holding that the economic loss doctrine did not bar tort claims for damages for fraudulent inducement of the contract by intentional misrepresentation. *See Douglas-Hanson Co. v. BF Goodrich Co.*, 607 N.W.2d 621, 621 (Wis. 2000). Because the Supreme Court of Wisconsin was equally divided, the decision of the appellate court was affirmed. *See id.*

In *Home Valu*, we were faced with the same question of whether a party could seek tort damages for an intentional misrepresentation claim that alleges fraudulent inducement of a contract. Noting that the Supreme Court of Wisconsin has been divided equally on the matter, we determined that, when faced with two equally plausible interpretations of state law, we generally choose the narrower interpretation that restricts liability rather than an interpretation that expands liability. *See Home Valu*, 213 F.3d at 965.

The issue of whether tort damages are barred by the economic loss doctrine for intentional misrepresentation claims alleging fraudulent inducement is once again before the Supreme Court of Wisconsin. That court has granted a petition for review in *Digicorp, Inc. v. Ameritech Corp.*, 650 N.W.2d 321 (Table), Nos. 01-1833, 01-2258, 2002 WL 1277220 (Wis. Ct. App. June 11, 2000) (unpublished opinion), *review granted by* 653 N.W.2d 888 (Wis. 2002).

In *Digicorp*, the Wisconsin trial court dismissed Digicorp's claims for negligent and strict responsibility misrepresentation as barred by the economic loss doctrine, but allowed the intentional misrepresentation claim to proceed to trial. The jury awarded approximately $250,000 in compensatory damages and $140,000 in punitive damages on the intentional misrepresentation claim that alleged that Ameritech fraudulently had induced Digicorp to enter

a contract. The Court of Appeals of Wisconsin upheld the *Digicorp* verdict. Relying on *Douglas-Hanson*, it held that "the economic loss doctrine does not preclude a plaintiff's claim for intentional misrepresentation when the misrepresentation fraudulently induces the plaintiff to enter into a contract." *Id.* at *7. Reviewing the rationale behind the economic loss doctrine, the Court of Appeals of Wisconsin agreed with the trial court that "it would be contrary to public policy to insulate parties from the consequences of fraudulent conduct by applying a doctrine that would preclude the defrauded party from *seeking tort damages.*" *Id.* at *8 (emphasis added, internal quotation marks and citations omitted). The Supreme Court of Wisconsin granted review and, on January 23, 2003, heard oral arguments on the issue in *Digicorp*.

**2.**

Neither *Home Valu, Douglas-Hanson, Digicorp*, nor any of the other cases discussed in the previous section addressed whether a party may *rescind* a contract based on fraudulent inducement or a misrepresentation. No Wisconsin court appears to have addressed squarely whether the economic loss doctrine bars a claim for fraudulent inducement (whether the misrepresentation is negligent, strict responsibility or intentional) when the remedy sought is rescission. However, the Supreme Court of Wisconsin has repeatedly recognized a party's right to seek rescission under contract law where its assent was induced by a material or fraudulent misrepresentation. The defrauded party can elect whether to seek rescission

or affirm the contract and seek damages.[7] We note that we have acknowledged that Wisconsin would allow such an action for rescission. *See Marine Bank, N.A. v. Meat Counter, Inc.*, 826 F.2d 1577, 1588 (7th Cir. 1987).[8]

---

[7] *See Bank of Sun Prairie v. Esser*, 456 N.W.2d 585, 588 (Wis. 1990) ("A material misrepresentation of fact may render a contract void or voidable."); *Merten v. Nathan*, 321 N.W.2d 173, 176 n.2 (Wis. 1982) (reviewing the "elements of fraudulent misrepresentation rendering a contract voidable"); *First National Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 537-39 (Wis. 1980) (examining the contract cause of action at length); *Malas v. Lounsbury*, 214 N.W. 332, 333 (Wis. 1927) ("Since *Wheelton v. Hardisty*, 8 E. & Bl. 232, in which Lord Campbell held that provision in a contract that it should be indefensible was 'subject to an implied exception of personal fraud which shall vitiate every contract,' it has been the rule that all contracts procured by fraud were voidable with the single exception of negotiable instruments."); *McClellan v. Scott*, 1869 WL 2064 (Wis. February Term, 1869) (holding that fraudulent representations inducing party to contract was grounds for avoiding the contract); *Eklund v. Koenig & Assocs., Inc.*, 451 N.W.2d 150, 153 (Wis. Ct. App. 1989) ("When a party discovers an alleged fraud . . . , he may affirm the contract and sue for damages, or he may disaffirm and seek restitution."); *Meas v. Young*, 405 N.W.2d 697, 700-01 (Wis. Ct. App. 1987) (noting that "[a]n action for rescission may be grounded on misrepresentation" and reviewing elements).

[8] *Cf. Barnsdall Refining Corp. v. Birnamwood Oil Co.*, 92 F.2d 817, 819 (7th Cir. 1937) (recognizing, in case arising in Wisconsin that a misrepresentation inducing another to contract "entitle[s] the party deceived thereby to avoid the contract or to maintain an action for the damages sustained," but doing so under a "general rule" of contract law a year before the Supreme Court case, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

The Supreme Court of Wisconsin has discussed rescission in the context of the relationship between contract and tort misrepresentation claims in *Whipp v. Iverson*, 168 N.W.2d 201 (Wis. 1969), and *First National Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530 (Wis. 1980).

In *Whipp*, the Supreme Court of Wisconsin refused to dismiss a complaint for failure to state a cause of action when the complaint alleged that the defendants had made a false representation, that the defendants knew or should have known that the statements were false, that the plaintiff relied on those statements, and, consequently, that the plaintiff was induced into entering into an agreement with the defendants. The plaintiff sought rescission of the agreement and return of the down payment. The defendants had moved to dismiss the complaint because the plaintiffs had failed to allege that defendants had made the false representations intentionally for the purpose of inducing the plaintiffs to sign the agreement—a required element of fraud claims in tort. In holding that dismissal was not proper, the Supreme Court of Wisconsin discussed the overlap of fraud/misrepresentation in tort and contract, noting that Prosser and Williston use the same classifications in their respective works on torts and contracts. The court concluded that "[c]ertainly what is grounds for damages in deceit [tort] is grounds for rescission, but rescission is not restricted to deceit." 168 N.W.2d at 204. The court went on to explain that "[u]nder modern liberality of pleading and the fusion of law in equity, a demurrer must be overruled if the complaint states facts which entitle the plaintiff to any relief. . . . We think therefore a cause of action is stated for rescission on the strict responsibility theory if not on the ground of deceit." *Id.*

In *Notte*, 293 N.W.2d 530, the Supreme Court of Wisconsin clarified further the relationship. The court reversed

and remanded the case for a new trial when the trial court had submitted the case to the jury on tort theories of negligent and intentional misrepresentation. The court explained:

> The confusion apparent in this case originates from the lower courts' and the parties' treatment of the issues raised in a framework based on traditional tort concepts of misrepresentation. Such treatment, however, is not appropriate. This is a suit to recover on a contract. . . . We therefore, look to principles of contract and suretyship law in framing the issues and formulating a mode of analysis.

*Id.* at 533. The court observed that

> [f]rom the defendant's answer it is apparent that he was attempting to avoid liability on the contract; not assert a claim for damages based on tort principles. . . . If [he] alleged by way of counterclaim, damages resulting from misrepresentations which induced him to enter the underlying contractual relationship, a different question would arise. The introductory note to the Restatement (Second) of *Contracts* dealing with misrepresentation discusses the interrelationship between contract and tort actions for misrepresentation. It is noted that avoidance is primarily dealt with in the contract action, while an affirmative claim for liability may lie for misrepresentation under the law of torts. Although the requirements for establishing misrepresentation sufficient to avoid a contract and the rules for establishing tort liability parallel each other closely, there are differences.

*Id.* at 533-34 (internal citations omitted). The court referred to its earlier decision in *Whipp*, where it had recognized the difference between rescission and damages actions

when law and equity were separate systems. *See id.* at
534. The court reviewed Wisconsin contract law for in-
stances when a misrepresentation makes a contract void-
able. *See id.* at 537-39. The court concluded: "If the
grounds for avoidance of the contract have been met,
the remedy is clear. The aggrieved party has the election
of either rescission or affirming the contract and seeking
damages. Mr. Notte in this case has sought relief
from his obligation under the contract." *Id.* at 539.[9]

### 3.

In addition to the well-established Wisconsin precedent
recognizing the existence of a contract misrepresentation

---

[9] PowerSports submits that Harley-Davidson should be judi-
cially estopped from claiming that its cause of action sounds
in contract because Harley-Davidson characterized its claims
in earlier pleadings as "tort" claims. We cannot agree with
this characterization of the record. In its earlier pleadings, Har-
ley-Davidson maintained that its actions were grounded in
the common law and that it did not simply bring an action
within the special expertise and jurisdiction of the Florida
Department of Highway Safety and Motor Vehicles. A claim
for rescission alleging that misrepresentations induced a party
to assent to a contract is a common law action whether charac-
terized as a tort or contract claim.

Additionally, and significantly, in those same pleadings,
Harley-Davidson relied on *Notte* for its claim for rescission. *See*
R.20 at 28. As we have discussed earlier, the Supreme Court
of Wisconsin in *Notte* expressly stated that the cause of action
at issue was one of contract and not of tort and that the par-
ties and the lower courts erred by construing the cause as aris-
ing in tort. Thus, in seeking rescission of contract, Harley-
Davidson specifically relied on Wisconsin's contract law of
misrepresentation.

action for rescission, the rationale behind Wisconsin's economic loss doctrine does not support a rule barring misrepresentation claims for rescission.

In general, the "economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 844-45 (Wis. 1998). Economic loss generally does not include damages "based on personal injury or damage to property" other than to the product giving rise to the commercial bargain. *Id.* at 845. The basic idea of the economic loss doctrine is that parties to a transaction (usually the commercial purchase of a product) cannot "end run around contract law" in order to recover tort damages. *Id.* at 850.

The Supreme Court of Wisconsin has explained,

> [a]pplication of the economic loss doctrine to tort actions between commercial parties is generally based on three policies . . . : (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Id.* at 846. This rationale does not apply to a misrepresentation claim when the remedy sought is rescission of contract.

The Supreme Court of Wisconsin explained that the policy of maintaining the distinction between contract and tort is based on the recognition that contract law "is better suited than tort law for dealing with purely economic

loss in the commercial arena." *Id.* at 846. Contract law should not drown in "a sea of tort." *Id.* at 849 (internal quotation marks omitted). The "heart of the distinction" between contract and tort "drawn by the economic loss doctrine is the concept of duty." *Id.* at 846. The law of torts imposes by law a "general duty of care to refrain from acts unreasonably threatening physical harm." *Id.* at 847. The law of contracts "rests on obligations imposed by bargain," that is, "the individual limited duties implicated by the law of contracts arise from the terms of the agreement between the particular parties." *Id.* at 846. However, both the laws of contract and tort recognize a duty not to fraudulently induce a person into a bargain. In tort, this duty arises as part of the general duty not to harm intentionally others or otherwise unreasonably cause harm. In the tort context, the Supreme Court of Wisconsin has stated that "[t]he law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so." *Household Fin. Corp. v. Christian*, 98 N.W.2d 390, 393 (Wis. 1959) (internal quotation marks and citations omitted). In contract, a duty not to defraud other contracting parties arises as part of the duty to bargain in good faith and fair dealing. *See In re Chayka*, 176 N.W.2d 561, 564 & n.7 (Wis. 1970) (stating that "the covenant of good faith [] accompanies every contract" and that "[e]very contract implies good faith and fair dealing between the parties to it"); *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 212-13 (Ct. App. Wis. 1995) (quoting and applying *Chayka*). In tort, the remedies are damages; in contract, the defrauded party is allowed to choose whether to affirm the contract and seek damages or to avoid the contract by having it rescinded.

Application of the economic loss doctrine to Harley-Davidson's claim would not drown contract duties in "a

sea of tort" duties, *see Daanen & Janssen*, 573 N.W.2d at 849 (internal quotation marks omitted), but would drown both contract and tort duties, allowing recovery in neither contract nor tort where both systems recognize that a duty has been violated. In *Daanen & Janssen*, the court explained that the party could not "recover in tort what are essentially contract damages. We see no reason to extend tort law into an area adequately governed by contract law." *Id.* at 847. The application of the economic loss doctrine to fraudulent inducement claims for rescission of contract would not prevent tort law from overreaching into contract law, but rather would restrict contract law from protecting the duty of good faith and fair dealing and the requirement of mutual assent, negating its well-established principles. If the economic loss doctrine barred misrepresentation claims for contract rescission, those claims would not be governed adequately by either contract or tort.

The second rationale for the economic loss doctrine is the need "to protect commercial parties' freedom to allocate economic risk by contract." *Daanen & Janssen*, 573 N.W.2d at 846. Recognizing the right to rescind a contract entered into under the circumstances of this case hardly impinges on the freedom of the parties to allocate risk by agreement. It simply requires that agreements be freely made and not be the product of either fraudulent or material misrepresentation. The Supreme Court of Wisconsin has recognized that "[f]reedom of contract is premised on a bargain freely and voluntarily made through a process of bargaining *which has integrity.*" *Merten*, 321 N.W.2d at 178 (emphasis added). The remedy of rescission, therefore, is not incompatible with the general policy of permitting the parties to a contractual relationship to determine allocation of risk. Indeed, affording this protection simply ensures that a party will not be

bound by a risk allocation that was assumed while under a misapprehension, induced by the other party, as to the nature of the attendant risks undertaken by the contract.

The Supreme Court of Wisconsin noted that the third rationale, allowing the purchaser to assume, allocate, or insure against the risk of loss, is meant to "promote[] efficiency and predictability in commercial relationships" and to ensure that the defendant will not pass to the consuming public the costs of tort damages in the prices of its products. *Daanen & Janssen*, 573 N.W.2d at 849-50. These benefits are not enhanced by applying the economic loss doctrine to bar misrepresentation claims seeking rescission. First, barring a party's claim for rescission of contract where its assent was induced by material or fraudulent misrepresentations would not protect the expectations of the contracting parties and would not "promote[] efficiency and predictability in commercial relationships." *Id.* at 849. Parties to a contract do not expect to be defrauded; rather they expect good faith and fair dealing, which, as mentioned before, is an implied covenant accompanying every contract under Wisconsin law. *See Chayka*, 176 N.W.2d at 564 & n.7.

Moreover, the costs of allowing the remedy of rescission, unlike the cost of allowing tort damages, would not be passed along to the consumer. The remedy of rescission is meant to put the party back in the position it would have been in. *See Schnuth v. Harrison*, 171 N.W.2d 370, 377 (Wis. 1969) ("The effect of a rescission of a contract is to restore the parties to the position they would have occupied had no contract ever been made. In other words, when a contract is rescinded the parties are placed in the status quo as if no contract had ever been made."); *Head & Seemann, Inc. v. Gregg*, 311 N.W.2d 667, 672 (Wis. Ct. App. 1981) (noting that "the purpose of rescission . . .

is to put the defrauded party back in as good a position as he occupied before entering the contract" (internal quotation marks and citations omitted)), *decision adopted as the opinion of the Supreme Court of Wisconsin by* 318 N.W.2d 381 (Wis. 1982).

In sum, the economic loss doctrine is intended to keep a party from effecting an "end run around contract law" to recover under tort law what it could not recover under contract law and through contract remedies. *Daanen & Janssen*, 573 N.W.2d at 850. Here Harley-Davidson is not seeking to "end run around contract law," *id.*; rather, it is seeking a remedy expressly given to it through contract law—rescission of contract as expounded in *Notte.* Harley-Davidson's claim for rescission does not give it something in tort that was unavailable to it in contract.

Accordingly, we conclude that, although the question of whether Wisconsin will apply the economic loss doctrine to bar intentional misrepresentation claims for damages is still an open question, we do not believe that this unsettled question places in doubt the well-established Wisconsin precedent that a party may bring a contract action for rescission on the ground that the party entered into the contractual relationship because of fraud or material misrepresentation. In our view, the holdings of the Supreme Court of Wisconsin in *Whipp* and in *Notte* make it quite clear that the Supreme Court of Wisconsin would take this approach rather than allow the economic loss doctrine to spread its dominion to a situation that simply does not implicate the policy concerns behind that doctrine.

**4.**

While Harley-Davidson is entitled to rescission, the matter is complicated by its prayer for damages. In its amended

complaint, Harley-Davidson sought "consequential and incidental damages" as well as punitive damages. R.26 at 13. In its response to PowerSports' motion for summary judgment, Harley-Davidson restyled its prayer as one for "restitution damages" and punitive damages. R.42 at 8 n.1.

As noted above, under Wisconsin law, if a party's assent to a contract is induced by material or fraudulent misrepresentations, that person can either seek rescission or damages. But Wisconsin law is quite clear that the defrauded party cannot seek both: "[I]f a claimant chooses to seek rescission, he may not sue for damages." *Head & Seemann, Inc.*, 311 N.W.2d at 669, *decision adopted as the opinion of the Supreme Court of Wisconsin by* 318 N.W.2d 381; *see also Seidling v. Unichem, Inc.*, 191 N.W.2d 205, 208-09 (Wis. 1971) (holding that rescission and enforcement of the contract were inconsistent remedies and that court could not "scramble[]" those "[t]wo eggs"); *Eklund*, 451 N.W.2d at 153 (holding that motion for rescission properly denied after verdict for damages because "remedy [of rescission] is inconsistent with an action at law for damages"); *Meas*, 405 N.W.2d at 699-700 n.3 ("We note that asking the court to rescind and affirming the contract and suing for damages are generally considered inconsistent remedies.").

However, as noted by the court in *Head & Seemann*, 311 N.W.2d 667, the definition of "damages" forbidden to a party electing rescission requires more precise elaboration; restitution damages are not barred. "Rescission is always coupled with restitution" because "rescission and restorative damages [are] entirely consistent with each other and therefore not subject to election." *Id.* at 667, 672; *see also Schnuth v. Harrison*, 171 N.W.2d 370, 377-78 (Wis. 1969) (allowing party electing rescission to recover

monetary award "needed to place him in the same posi-
tion he was in before the contract"). Thus, Harley-David-
son, if it prevails, may recover restitution damages "to
restore [it] to the position [it] would have occupied had
no contract ever been made." *Schnuth,* 171 N.W.2d at 377.

Harley-Davidson, however, even if it prevails, will not
be able to recover punitive damages. "Wisconsin does
not allow punitive damages to be awarded in the ab-
sence of an award of actual damages. Nor are punitive
damages available as a remedy for breach of contract
actions." *Weiss v. United Fire & Cas. Co.,* 541 N.W.2d 753,
763 (Wis. 1995) (internal quotation marks and citations
omitted); *Autumn Grove Joint Venture v. Rachlin,* 405
N.W.2d 759, 762-63 (Wis. Ct. App. 1987). In *Weiss,* the
Supreme Court of Wisconsin recognized that even when
both tort and contract theories of recovery were available,
punitive damages were not allowed unless actual dam-
ages had been awarded under the tort theory of recovery.
*See Weiss,* 541 N.W.2d at 763-64. Here, as explained
above, if Harley-Davidson seeks rescission, its claim for
damages under a tort theory is not available as an incon-
sistent remedy. Thus Harley-Davidson cannot recover
punitive damages below.

## C.

Having established that Wisconsin has recognized a
contract claim for rescission based on fraudulent induce-
ment or misrepresentation and having demonstrated the
lack of a relationship between that doctrine and the eco-
nomic loss doctrine, we must determine whether, on
this record, Harley-Davidson can withstand a motion for
summary judgment.

As we have noted, in *Notte,* the Supreme Court of Wis-
consin reviewed the elements for a contract claim for

rescission based on fraudulent inducement or misrepresentation. The court explained that, under contract law, even innocent representations in some circumstances may entitle a party to rescission. The court adopted the Restatement's approach to determining when a contract will be deemed voidable and subject to rescission by one of the parties, namely: "When [1] a party's manifestation of assent is induced [2] by either a fraudulent or a material misrepresentation by the other party, the contract is voidable by the recipient [3] if he is justified in relying on the misrepresentation." *Notte*, 293 N.W.2d at 538 (internal quotation marks and citations omitted). The court explained that "[a] misrepresentation is an assertion that does not accord with facts as they exist." *Id.* The court noted that a "misrepresentation is material if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by the misrepresentation." *Id.* In a footnote, the court stated that "[i]f there is fraud [in the sense that the defendant intended to deceive the plaintiff], there is no requirement that the misrepresentation be material." *Id.* at 538 n.7. The court then quoted the Restatement to define "fraud":

> A misrepresentation is fraudulent if the maker intends thereby to induce a party to manifest his assent and the maker
>
> > (a) knows or believes that his assertion is not in accord with existing facts, or
> >
> > (b) does not have the confidence in the truth of his assertion that he states or implies, or
> >
> > (c) knows that he does not have the basis for his assertion that he states or implies.

*Id.* (internal quotation marks and citations omitted). As to the element of justifiable reliance, the court did not agree that Notte's reliance was not justified merely because he was allegedly negligent in failing to discover the facts behind the misrepresentations made. The court explained that "[t]he recipient's fault in failing to discover the facts before entering the contract does not make his reliance unjustified unless his fault amounts to a failure to act in good faith or to conform his conduct to reasonable standards of fair dealing." *Id.* at 539.

PowerSports contends that summary judgment should be granted on multiple grounds. We shall discuss each.

### 1.

PowerSports contends that summary judgment should be granted because it timely disclosed its business plans by mailing Harley-Davidson the draft memorandum before Harley-Davidson sent its approval. PowerSports submits that the facts concerning timeliness are undisputed. It notes that it is undisputed that the draft memorandum was delivered to Harley-Davidson six hours before Harley-Davidson sent its approval.

However, the facts that PowerSports characterizes as "undisputed" facts give rise to disputed inferences. At summary judgment, we must review the underlying facts in the light most favorable to the nonmoving party. The phrase "in the light most favorable to the nonmoving party," as we have previously explained, "simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). That is, "[t]he choice between reasonable inferences from facts" is a function of

a fact-finder, and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate. *Id.*

It is undisputed that (1) Harley-Davidson informed PowerSports that it would give its answer on January 5th; (2) Harley-Davidson repeatedly had requested in the prior two months documents concerning, and information about, PowerSports' business plans, particularly about their plans for the Fern Park dealership and any possible plans to go public; (3) PowerSports mailed the draft memorandum overnight delivery on January 4th, knowing that it would arrive the day that Harley-Davidson was delivering its decision; and (4) the draft memorandum remained in Harley-Davidson's mailroom until January 6th and thus was not seen until after Harley-Davidson had granted approval.

From these facts, a fact-finder would be entitled to determine that PowerSports timely disclosed the memorandum. However, drawing all inferences in the light most favorable to the nonmoving party, as we must, a fact finder also could infer reasonably that PowerSports intentionally or negligently delivered the memorandum in such a way and at such a time that the relevant individuals at Harley-Davidson would become aware of its contents only after they already had given PowerSports approval. Harley-Davidson technically would have received the memorandum in its mailroom at the same time or slightly before the approval was given. In short, the facts support an inference of actionable conduct, if the trier of fact wishes to make certain permissible inferences from the established adjudicative facts. There are no established facts that make such an inference unreasonable or demonstrate that PowerSports made any attempts to ensure that the relevant individuals at Harley-

Davidson actually had received and had time to evaluate the contents of the memorandum before Harley-Davidson gave its approval. Because there are conflicting inferences concerning whether or not PowerSports timely disclosed its business plans, summary judgment is not appropriate.

## 2.

PowerSports next submits that Harley-Davidson cannot rely on oral misrepresentations because it later received written statements that "qualified" the oral representations or at least put Harley-Davidson on notice of a need for independent investigation. Appellees' Br. at 32. Specifically, PowerSports contends that its statement that it intended to comply with "all lawful aspects" of the dealer contract should have alerted Harley-Davidson to the alleged misrepresentations. *Id.* at 34. However, the Supreme Court of Wisconsin in *Notte* recognized that, in a claim for rescission under contract law, the plaintiff's reliance would not be "unjustified unless [its] fault amounts to a failure to act in good faith or to conform [its] conduct to reasonable standards of fair dealing." *Notte*, 293 N.W.2d at 539. PowerSports' evidence does not allow for such an inference.

## 3.

We turn next to the issue of whether PowerSports' failure to disclose its plans violated its contractual obligation to

proceed in good faith and fair dealing.[10] "Wisconsin applies the position taken in the Restatement (Second) of Contracts in determining whether a misrepresentation

[10] PowerSports, relying on tort misrepresentation law, *see Ollerman v. O'Rourke Co.*, 288 N.W.2d 95 (Wis. 1980), submits that, as to its omissions, it owed Harley-Davidson no duty to disclose the business plans contained in the draft memorandum. In *Ollerman*, the Supreme Court of Wisconsin explained that, in tort misrepresentation claims, a party to a business transaction only has a duty to disclose under certain circumstances. One of those circumstances is that a party to a business transaction has a duty to disclose "facts basic to the transaction." *Id.* at 104-05 n.18. PowerSports argues that the draft memorandum and its internet, dealership and public ownership plans disclosed in the draft memorandum are not "basic facts." Harley-Davidson contends that they are.

Facts are basic to the transaction if (1) the person "knows that the other is about to enter into" the transaction under a mistaken view about those facts and (2) a special relationship or other "objective circumstances" creates a reasonable expectation of disclosure of those facts. *Id.* It would be reasonable to infer that PowerSports knew that Harley-Davidson had a mistaken view of the facts; moreover, Harley-Davidson's requests for information on these specific issues might constitute objective circumstances creating a reasonable expectation of disclosure. As the Court of Appeals of Wisconsin has explained, the key to determining whether a duty of disclosure exists is "whether the mistaken party would reasonably expect disclosure." *Hennig v. Ahearn*, 601 N.W.2d 14, 22 (Wis. Ct. App. 1999). A jury could certainly infer from the above facts that Harley-Davidson would reasonably expect disclosure of PowerSports' plans. Thus, even if this were a tort misrepresentation claim, summary judgment could not be granted because it is at least reasonably inferable that PowerSports' omissions were of basic facts and thus PowerSports had a duty to disclose to Harley-Davidson.

theory of defense voids a contract." *Marine Bank*, 826 F.2d at 1580 (citing *Notte*, 293 N.W.2d at 538). According to the Restatement:

> A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:
>
> (a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.
>
> (b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
>
> (c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.
>
> (d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.

Restatement (Second) of Contracts § 161. It is inferrable that PowerSports' non-disclosure would be the equivalent of an affirmative misstatement under contract law.

Moreover, there is a genuine issue of material fact as to whether PowerSports made affirmative material misrepresentations (rather than mere omissions). Under contract law, when seeking rescission based on misrepresentation, all that is required is that "a party's manifestation of assent is induced by either a fraudulent or a material misrepre-

sentation by the other party." *Notte*, 293 N.W.2d at 538. In order to be material, a misrepresentation merely has to be likely to induce a reasonable person to manifest his assent, or the maker has to know "that it is likely that the recipient will be induced to manifest his assent by the misrepresentation." *Id.* Harley-Davidson explained its expectations for how dealers should run Harley-Davidson dealerships and repeatedly asked for information concerning PowerSports' plans for the Fern Park dealership and for going public. From these facts, it could be inferred that PowerSports knew that its representations that it would operate a community-oriented, exclusive Harley-Davidson dealership, owned by a company that was not going public, would induce Harley-Davidson to approve the transfer and thus were material misrepresentations. *See id.*

### 4.

Finally, PowerSports argues that there were no misrepresentations because the statements and omissions concern future performance and promises and thus are not statements concerning present facts. Again, looking to the Restatement, a "misrepresentation" is defined as "an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159. The comment explains:

> An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events. . . . However, a promise or a prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts.

*Id.* cmt. c. Furthermore, in discussing reliance, the Restatement provides:

> A statement as to the intention of either the maker or a third person is an assertion of a fact, his state of mind, just as a statement of his opinion is such an assertion. It is therefore a misrepresentation if that state of mind is not as asserted. However, the truth of a statement as to a person's intention depends on his intention at the time that the statement is made and is not affected if he subsequently, for any reason, changes his mind. In order for reliance on an assertion of intention to be justified, the recipient's expectation that the maker's intention will be carried out must be reasonable.

Restatement (Second) of Contracts § 171, cmt. a. Nevertheless, the Restatement comment further explains that a contract would not be voidable if a court concluded, after considering all of the circumstances, that "the buyer's misrepresentation is not contrary to reasonable standards of dealing." *Id.*

In this case, there is at least a material question of fact as to whether PowerSports had a present intent of not going public and of focusing on the local Seminole County market. PowerSports expressed in written and oral communications its intent not to go public and its local-market plans. From the documents produced in discovery, it is inferable that PowerSports did not actually intend to use the Fern Park dealership as it represented to Harley-Davidson or to refrain from going public or divesting itself of the Harley-Davidson dealership if it did go public.

The Restatement also states that if a "promise is made with the intention of not performing it, this implied assertion is false and is a misrepresentation. The promise itself

need not be made in words but may be inferred from conduct or even supplied by law. Nor does it need to be a legally enforceable promise." *Id.* at cmt. b. Again, as testified to by Harley-Davidson's representatives, and construing the facts in the light most favorable to Harley-Davidson, PowerSports' alleged promise that it would not go public or would divest itself of the dealership if it did was incompatible with the statements found in the draft memorandum. Thus it is at least inferable that PowerSports made that promise "with the intention of not performing it." *Id.*

Accordingly, we must conclude that PowerSports is not entitled to summary judgment on this record.

## Conclusion

Harley-Davidson has stated a viable cause of action for contractual rescission. There is no indication that the Supreme Court of Wisconsin would consider the economic loss doctrine applicable to such a rescission action. Moreover, PowerSports is not entitled to summary judgment on this record. Many of the adjudicative facts of the case are undisputed. Nevertheless, the reasonable inferences arising from those facts are disputed and create genuine issues of material fact. Accordingly, the judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion. Harley-Davidson may recover its costs in this court.

REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*